UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CEDRIC SHINE,<br><br>                        Plaintiff,<br><br>v.<br><br>MAJOR LEAGUE SOCCER, L.L.C.,<br>SOCCER UNITED MARKETING, LLC,<br>JOHN DOE 1-5, and<br>DOE CORPORATIONS 1-5,<br><br>                        Defendants. | Docket No.<br><br>**COMPLAINT** |

Plaintiff CEDRIC SHINE, by and through his attorneys, KOVEL LAW PLLC, hereby alleges as follows:

**INTRODUCTION**

1. Plaintiff Cedric Shine ("Shine") brings this action against his former employer, Defendant Major League Soccer, L.L.C., and its subsidiary Soccer United Marketing, LLC (together "MLS"), to enforce his rights in response to MLS's unlawful retaliation against him for his protected complaints of race discrimination, including the termination of his employment.

2. From the time of his hiring until February 2025, Shine, who is a Black man, was a thriving brand marketing executive for MLS.

3. During much of the same time Shine was also the co-chair of the MLS employee resource group for Black employees called "PITCH BLACK."

4. In early February 2025, shortly after receiving new direct supervisors, Shine was told by a senior executive that he was about to be promoted from Director to Senior Director.

5. Shockingly, days later Shine's new direct managers subsequently decided not to

1

promote him.

6. The decision to block Shine's promotion came mere weeks after Shine's new supervisors terminated one of the few Black Directors in the Marketing Department, Justin Cox, and contemporaneously with their decision to promote a Caucasian MLS Marketing Director with less remit than Shine to Senior Director but not Shine.

7. Considering this reality, Shine complained to MLS HR about the decision to block his promotion and its racial implications.

8. As a result of Shine's complaint, MLS decided to promote Shine over his supervisors' objections.

9. From the time of Shine's complaint onwards, Shine's supervisors engaged in a campaign of retaliation against him.

10. Shine further complained on numerous occasions to both HR and other members of MLS leadership, who did nothing to protect him from his management team.

11. As a last resort, Shine attempted to schedule a meeting with MLS Deputy Commissioner Gary Stevenson, who oversaw the leadership team that had been retaliating against Shine.

12. Rather than permit Shine to have this meeting with Stevenson, MLS permitted and condoned Shine's management team to terminate him.

13. MLS committed these intentional and willful acts in violation of Shine's rights guaranteed to him by, among other things, the statutory prohibitions against retaliation found within the New York City Human Rights Law.

**JURISDICTION AND VENUE**

14. This Court has original jurisdiction over the subject matter of this litigation pursuant

to 28 U.S.C. § 1332 because Plaintiff's claims exceed $75,000, exclusive of interest and costs, and the parties are diverse.

15. Venue is proper under 28 U.S.C. § 1391(b) because the events underlying this action occurred within the Southern District of New York and because the Defendants have a principal place of business in this District, where Plaintiff worked.

## THE PARTIES

16. Plaintiff Cedric Shine is an individual who is, and at all relevant times was, a resident of Bloomfield, New Jersey. Shine was employed by MLS from December 20, 2022, until his unlawful termination on May 9, 2025.

17. Defendant Major League Soccer, L.L.C., was and is a Delaware limited liability company with a principal place of business located at 420 Fifth Avenue, New York, New York 10018, where Shine worked.

18. Defendant Soccer United Marketing, LLC, was and is a Delaware limited liability company with a place of business located at 420 Fifth Avenue, New York, New York 10018, where Shine worked. Upon information and belief, it is the for-profit subsidiary entity of Major League Soccer, L.L.C., responsible for MLS' marketing and advertising endeavors.

19. At all relevant times, MLS was Shine's employer within the meaning of the New York City Human Rights Law.

## PROCEDURAL PREREQUISITES

20. Plaintiff has satisfied all the procedural prerequisites for the commencement of the instant action because contemporaneously with the filing of this Complaint, Plaintiff mailed copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York ("Corporation Counsel") pursuant to the notice

requirements of § 8-502 of the New York City Administrative Code. A copy of the transmittal letters to the NYCCHR and Corporation Counsel is annexed hereto as Exhibit A.

## FACTUAL BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

### *Shine Hired by MLS and Flourishes in Role*

21. In December 2020, Shine began working for MLS as a marketing professional. His first role was Director, Marketing Platforms & Development. Shine then became Director of Culture Marketing and later, Senior Director of Culture Marketing.

22. In his roles, Shine was responsible for, among other things, brand strategy and event marketing for different aspects of MLS's portfolio of brands and businesses.

23. Shine also served as the Co-Chair of MLS's employee resource group, known internally as "PITCH BLACK," and was a founding member of MLS's "Marketing Culture Council," which served as the employee resource group specifically for the various MLS marketing teams.

24. In his roles as Marketing Director, Shine reported to the Vice President of Brand and Integrated Marketing, which until February 7, 2025, was Jesse Perl.

25. Shine was experienced and fully qualified for his positions at MLS, as confirmed by, among other things, his previous marketing roles with other large media and entertainment companies, including Google and Spotify, and his educational background, which included a Bachelor of Arts degree from Temple University.

26. Shine successfully executed his duties to MLS's satisfaction, as confirmed by his performance reviews.

*Shines Reporting Structure Changes, CMO Denies Shine a Promotion, and*

*Shine Complains to Human Resources*

27. On February 7, 2025, MLS terminated Shine's manager, Jesse Perl, and newly appointed Vice President of Brand, Marciela Garcia, and her supervisor, SVP and Chief Marketing Officer Radhika Duggal, assumed direct managerial responsibility for Shine and his work.

28. At the time Shine was dismayed that Perl had been terminated, but he was excited for the opportunity to work more closely with Garcia and Duggal, who had been recently hand-selected for their roles by one of MLS's most senior leaders, Executive Vice President of MLS' Partnership with Apple Inc., and Properties & Events, Camilo Durana,

29. On February 20, 2025, Shine learned from a member of MLS senior management that MLS had recently approved Shine's promotion to Senior Director, which Shine later confirmed with a senior member of the MLS Human Resources team.

30. Shine was grateful for this promotion given the work he had recently led, including delivering the complete culture marketing strategy for fiscal year 2025 for Duggal to present to senior leadership and the exciting events that were ahead for 2025, including MLS tentpole events with now-GRAMMY Award winning music recording artist Doechii and other notable public figures.

31. However, on February 24, 2025, despite the assurances he received from senior management and human resources only days earlier, Shine learned that Duggal had blocked his promotion. Shine was devastated.

32. Shockingly, the decision to block Shine's promotion came mere weeks after Duggal terminated one of the few Black Directors in the Marketing Department, Justin Cox, and contemporaneously with Duggal's decision to promote a Caucasian MLS Marketing Director with

5

less remit than Shine to Senior Director but not Shine.

### *Shine Formally Complains to MLS about Duggal*

33. On February 25, 2025, Shine asked to speak with Duggal and Garcia about their decision to block his promotion.

34. At the meeting, Duggal and Garcia changed their prior justification for blocking Shine's promotion, which only raised more concerns for Shine that his new managers could not even state a basis rooted in the business, or in fact, for their decision. At the conclusion of the meeting, Shine told Duggal and Garcia that he intended to speak with MLS HR about their decision.

35. The next day, on February 26, 2025, Shine complained to HR, which resulted in a meeting the same day between Bethany Tressler, VP of Human Resources, Jennifer Carrol, SVP of Human Resources, and Shine.

36. During the meeting with Tressler and Carrol, Shine highlighted that he was included on the promotion list and complained about his removal only days later.

37. Importantly, Shine also tearfully complained to Tressler and Carrol that it is unfair that Black employees at MLS like Shine must work "twice as hard" to receive a "sliver of the results" of their White counterparts, and that it was especially hurtful because after their meeting he would be hosting a Black History Month luncheon for all MLS employees.

38. The following day, February 27, 2025, Duggal requested and met with Shine again regarding her decision to block his promotion.

39. During this meeting, Duggal was visibly uncomfortable and upset that Shine complained to HR about her decision to block his promotion and asked Shine to discuss his complaint with her again.

40. During this conversation, Shine told Duggal that he was especially disappointed to

6

have had to complain about these issues coming from Duggal, as Duggal had previously discussed with Shine her own experiences navigating workplaces as a racial minority. Shine told Duggal that he was disappointed that he would face this type of discrimination from her, as a result.

41. In the same meeting, Duggal told Shine that once again MLS had changed course and that he was now promoted to Senior Director.

42. Following the meeting, Shine sent an email thanking the marketing leadership team and HR for reviewing his candidacy and stressed how he wanted to work together to make MLS a success. No one responded to his email.

### *Duggal and Garcia Retaliate Against Shine*

43. Immediately following his promotion, Duggal and Garcia turned on Shine and began retaliating against him for his protected complaint to HR, which included, by way of example:

- Berating Shine that the KPI goals for his marketing activations subjectively "lacked storytelling" without fully explaining what was meant by that criticism and holding Shine and his work product to more stringent standards than other reports;

- Dismissing Shine's work questions as unimportant and walking away from him while he asked questions at work;

- Cancelling MLS funding for event marketing activations that Shine had worked for months to put together, which made Shine look incompetent to outside partners and internal stakeholders who believed the events were in the pipeline;

- Removing money from the culture marketing budget Shine oversaw to fund marketing overages elsewhere, leaving relatively small sums for Shine to

complete his work;

- Highlighting the contributions of other members of the marketing team for work that Shine led, but not Shine, which minimized Shine in front of the wider marketing team;

- Deliberately avoiding participating in press opportunities tied to Shine's activations, despite earned media being a key performance metric for Shine's role as Senior Director of Culture Marketing;

- Abruptly leaving Shine's MLS marketing events—including a live panel Shine produced and participated in—which led both external MLS corporate partners and MLS executives in attendance to question why marketing leadership was leaving the event and reflected extremely poorly on Shine;

- Asking Shine's dotted line report to send investigatory emails to external stakeholders of Shine's work to interrogate how funds were being appropriated, which made Shine look terrible to his reports and these external stakeholders and eroded his business relationships;

- Fabricating issues with the punctuality of Shine's work product in a written negative performance evaluation, which was false and alarmingly not addressed in the in-person performance evaluation that happened before Shine complained to human resources about the discrimination he endured; and

- Threatening Shine that if he questioned their views of his performance "it would be frowned upon" and that he "would be seen as someone who lacks the ability to accept constructive criticism."

The above are merely examples of Dugal and Garcia's retaliation against Shine which, given that these examples immediately followed Shine's complaint and departed entirely from the ways in which Shine was treated before his complaint, demonstrate that Shine was unlawfully targeted for his protected complaint.

44.     At many moments when Shine faced these and other acts of retaliation, he further complained to human resources and senior members of MLS leadership and even requested that MLS change his reporting structure to protect him from the toxic leadership team that had been retaliating against him for weeks.

45.     Despite Shine's additional complaints, MLS took no action to help him.

46.     The retaliation Shine endured from Duggal and Garcia eroded his emotional wellbeing and mental health to such a degree that Shine had to start an already planned vacation period early, at the urging of MLS HR, to recover from the unlawful behavior of Marketing leadership, which lasted until April 7, 2025.

### *Durana Protects Duggal and Garcia from Shine's Continued Complaints*

47.     When Shine returned, he was instructed to meet again with human resources, where he again complained that he was targeted by Duggal and Garcia and set up for failure in that the budget supposed to be used to fund his work had been given away.

48.     MLS HR told Shine they would investigate these matters but never did.

49.     Following Shine's meeting with MLS HR, Duggal and Garcia's supervisor (and Shine's skip-supervisor), EVP Camilo Durana, intervened on Duggal and Garcia's behalf and asked for a meeting with Shine.

50.     During the meeting, Durana dismissively demanded that Shine tell him the "thirty second version" of Shine's complaints about Duggal and Garcia.

51. When Shine tried to explain what had happened, Durana made it clear that he did not find Shine's complaints to be important.

52. Durana also told Shine during this meeting that he "stand(s) behind [Duggal] one hundred percent" and feels that Garcia "is the best marketer at the company."

53. Shine replied that if that if this is the way Durana feels, then Shine is "the odd man out."

54. Durana ignored Shine's response and instead coerced Shine to "move on" and rehabilitate his working relationships with Duggal and Garcia.

55. From this meeting onwards, Durana actively retaliated against Shine for complaining about his direct reports, which included Durana taking Shine off emails on critical workstreams with key influencers that Shine was leading that were tied to his goals.

56. Further, on or about April 29, 2025, Durana harshly criticized Shine for offering constructive written feedback to Shine's dotted line report.

57. It was highly unusual for Durana, a manager who was three reporting levels above Shine, to even participate in handling questions regarding the way Shine offered criticism to a direct report and demonstrated to Shine that Durana supported everyone but Shine, which further isolated him from the rest of the marketing team that Durana led.

58. During this meeting Shine reiterated to Durana that he felt he was being unfairly targeted and that Durana had never come to his aid when Shine knew Durana was aware of the unfair treatment Shine was experiencing.

59. Shine's mental health continued to erode following his meeting with Durana, and Shine's psychiatrist formally requested to MLS that Shine be placed on intermittent work accommodations.

60. MLS ignored Shine's psychiatrist's written request.

61. After this request, in further retaliation, Garcia removed Shine from meetings related to the project that Shine had been leading until then.

62. On May 7, 2025, Shine made one final attempt to alert Durana's supervisor, MLS Deputy Commissioner Gary Stevenson, to discuss his concerns.

63. Stevenson told Shine to find time on his calendar with his secretary, which Shine did the next day.

64. Two days later, on May 9, 2025, before Shine had the chance to complain to Stevenson about Durana's behavior, MLS fired Shine.

65. Durana and his cohort hastily and urgently demanded to terminate Shine before the meeting with Stevenson even though Shine was out of the office and had already requested an additional leave to deal with his mental health, and the health of his mother-in-law.

66. MLS's termination email did not even offer an explanation to Shine about why he was being terminated.

67. MLS's actions left Shine shocked and dismayed.

68. Making matters even worse, MLS later accused Shine of using profanity on a phone call almost one month prior, as their excuse for their urgent need to terminate him.

69. MLS's excuse, which was created only after it terminated Shine without offering a basis for his termination, serves as nothing more than pretext to excuse their unlawful termination of Shine for his protected complaints, including Shine escalating his complaints to Durana's supervisor two days before he was fired.

70. As a result of MLS's conduct, Shine has suffered the adverse effects of unlawful retaliation, the quality of his life has been irreparably damaged and his self-esteem, self-respect,

and well-being have been irreversibly harmed because he has been subjected to the humiliating and demeaning type of conduct described herein, all of which will continue to be a source of humiliation, distress, and financial loss to Shine.

71. MLS acted with willful or wanton negligence, or recklessness, or a conscious disregard of Shine's rights under, among other things, the New York City Human Rights Law, and its unlawful actions against Shine were so reckless as to amount to a disregard of Shine's rights. Accordingly, in addition to damages inflicted upon Shine, MLS should be required to pay punitive damages as punishment for its discriminatory and retaliatory conduct to deter it and others similarly situated from engaging in such conduct in the future.

## AS AND FOR A CAUSE OF ACTION AGAINST MAJOR LEAGUE SOCCER
### NYCHRL: Retaliation

72. Shine reincorporates and readopts each allegation contained within this Complaint, as if fully set forth here.

73. At all times relevant hereto, Shine and his employment with MLS was protected by the New York City Human Rights Law.

74. MLS retaliated against Shine by sidelining him and his work and then terminating him, all of which began days after he complained that his race played a role in his manager's decision to block his promotion.

75. MLS's actions constitute unlawful retaliation against Shine in violation of §8-107(7) of the New York City Human Rights Law, which provides, *inter alia* that:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has … (i) opposed any practice forbidden under this chapter.

76. As a proximate result of MLS's conduct, Shine has been adversely affected in his employment and career, emotional well-being, the quality of his life and in his normal life's pursuits, and Shine believes MLS's conduct, complained of herein, has and will continue to have a negative effect upon him.

77. Here, MLS's conduct towards Shine shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of Shine's rights under the New York City Human Rights Law, or that its unlawful actions against Shine were so reckless as to amount to a disregard of Shine's rights, so that in addition to all the damages inflicted upon Shine and in addition to all the measures of relief to which Shine may be properly entitled herein, MLS should additionally be required to pay punitive damages as punishment for their discriminatory conduct, in order to deter MLS and others similarly situated from engaging in such conduct in the future.

78. Shine, therefore, seeks compensatory damages for this cause of action, including, among other things, for loss of earnings and earning capacity and for the emotional harm inflicted upon him, in an award to be determined at a trial of this matter, as well as punitive damages, reasonable attorney's fees, the costs of this action and pre-judgment interest.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues so triable.

**WHEREFORE,** Plaintiff Cedric Shine demands judgment against Defendants MAJOR LEAGUE SOCCER, L.L.C., SOCCER UNITED MARKETING, LLC, JOHN DOE 1-5, and DOE CORPORATIONS 1-5, on the Cause of Action for compensatory damages and punitive damages, plus costs, pre-judgment and post-judgment interest and attorneys' fees as permitted

under the law, and for such other and further relief as this Court deems just and proper.

Dated: New York, New York
       July 18, 2025

                                           **KOVEL LAW PLLC**

                                           /s/ Daniel H. Kovel
                                           DANIEL H. KOVEL (DK6676)
                                           14 East 96th Street, Suite #3
                                           New York, New York 10128
                                           P: (646) 397-1729
                                           E: dkovel@kovel-law.com

                                           *Attorneys for Plaintiff*

# EXHIBIT A



Kovel Law PLLC
14 East 96th Street Suite #3
New York, New York 10128
phone: 646.397.1729
e-mail: dkovel@kovel-law.com

July 18, 2025

**Via USPS Certified Mail, Return Receipt Requested**

Hon. Annabel Palma, Chair and Commissioner
New York City Commission on Human Rights
22 Reade Street
New York, NY 10007

Hon. Muriel Goode-Trufant
Corporation Counsel of the City of New York
New York City Law Department
100 Church Street
New York, NY 10007

**RE:   CEDRIC SHINE v. MAJOR LEAGUE SOCCER, L.L.C.,
           SOCCER UNITED MARKETING, LLC,
           JOHN DOE Nos. 1 to 5 and DOE CORPORATIONS Nos. 1 to 5**

Your Honors:

      Pursuant to the notice requirements of Section 8-502 of the New York City Administrative Code, please find enclosed copies of the Complaint in the above-referenced action, which today is being filed in the United States District Court for the Southern District of New York.

Respectfully submitted,

Daniel H. Kovel

Enc.